**ABINGTON SCHOOL DISTRICT,**
Petitioner

v.

**DEPARTMENT OF EDUCATION,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 12, 2012.
Decided Jan. 7, 2013.

matters is the more suitable remedy.

Amy H. Taylor Brooks and Michael D. Kristofco, Blue Bell, for petitioner.

Alaina C. Koltash, Assistant Counsel, Harrisburg, for respondent.

Jeffrey F. Champagne, Harrisburg, for intervenor Pennsylvania Alliance of Approved Private Schools.

BEFORE: PELLEGRINI, President Judge, and LEADBETTER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge.

OPINION BY President Judge PELLEGRINI.

This appeal involves what level of funding the Abington School District (District) is entitled to for the education of two special education students at Approved Private Schools (APS) under Section 1376 of the Public School Code of 1949 (Code)[1]

---

1. Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. § 13–1376. Subsections (a.2) and (c.5) were added by the Act of July 4, 2004, P.L. 536, Section 10. That section, entitled "Costs of tuition and maintenance of certain exceptional children in approved institutions," provides, in relevant part:

> (a) When any child between school entry age and twenty-one (21) years of age and resident in this Commonwealth, who is blind or deaf, or has cerebral palsy and/or neurological impairment and/or muscular dystrophy and/ or is mentally retarded and/or has a serious emotional disturbance and/or has autism/pervasive developmental disorder and is enrolled, **with the approval of the Department of Education, as a pupil in an approved private school approved by the Department of Education** ... the school district in which such child is resident or, for students placed by a charter school, the charter school in which the student was enrolled, shall pay the greater of either twenty per centum (20%) of the actual audited cost of tuition and maintenance of such child in such school, as determined by the Department of Education, or its "tuition charge per elementary pupil" or its "tuition charge per high school pupil," as calculated pursuant to section 2561, and the Commonwealth shall pay, out of funds appropriated to the department for special education, the balance due for the costs of such child's tuition and maintenance, as determined by the department.... For the 2004–2005 school year and each school year thereafter, the school district or charter school payment shall be the greater of forty percent (40%) of the approved tuition rate ... or the school district or charter school's "tuition charges per elementary pupil" or "tuition charges per secondary pupil" as calculated under section 2561, and the Commonwealth shall pay out of funds appropriated to the department for approved private schools the balance of the

where there are no preapproved "slots" at those schools and the budget appropriation for that purpose has been exhausted.

Before we address the specifics of this case, some background is needed. Generally, school districts are responsible for educating all students residing within their respective boundaries. *See* Sections 1302 and 1372 of the Code, 24 P.S. §§ 13–1302, 1372. One of the goals of the Department of Education (Department) is to provide all exceptional children in the Commonwealth with an appropriate educational program. *Veschi v. Northwestern Lehigh School District*, 772 A.2d 469, 473 (Pa.Cmwlth.2001). The primary responsibility for identifying all exceptional children and developing educational programs to meet their needs rests with the local school district. *Id.* While school districts are obligated to pro-

vide and maintain the special education classes or schools necessary to educate exceptional students, if it is not feasible for a school district to do so, it must secure such education and training outside the public schools of the school district or in special institutions. 24 P.S. § 13–1372(3). Regardless of whether a school district provides educational services to its special education students or secures such education outside of the school district's schools, the school district remains financially responsible for the costs associated with the education of those students. *See* 24 P.S. § 13–1372(5) (providing that school districts are responsible for reimbursing the Commonwealth when the Commonwealth provides education to the school district's special education students); Sec-

approved tuition rate due for the cost of such child's tuition and maintenance....

\* \* \*

(a.2) For the 2005–2006 school year and each school year thereafter, the Department of Education shall determine the payment amount for each approved private school for all students enrolled in an approved private school for the prior school year as follows:

(1)(i) Multiply the payment determined for the immediate preceding school year by one hundred and twenty-five percent (125%) of the percentage increase in the appropriation for special education for the fiscal year prior to the fiscal year in which payments under this subsection are made.

(ii) Add the product from subparagraph (i) to the payment determined for the immediate preceding school year.

\* \* \*

(3) The Department of Education shall pay each approved private school the total amount calculated pursuant to this subsection divided into twelve (12) monthly payments. The Department of Education shall withhold the school district or charter school payment amount calculated under subsection (a) from the amount of any and all State payments made to the school district or charter school. **In no event shall the sum of the Commonwealth's share of**

**payments to approved private schools under this subsection exceed the appropriation for approved private schools.**

\* \* \*

(c.5) For payments made during the 2005–2006 school year and each school year thereafter ... the Department of Education shall establish an approved tuition rate or rates and full-time equivalent enrollment for each approved private school for the current school year. Where an approved private school has submitted one tuition rate, the approved tuition rate shall be determined by dividing the amount calculated under subsection (a.2) by the full-time equivalent enrollment for the approved private school for the prior school year. Where an approved private school has submitted more than one tuition rate, the sum of the products of each approved tuition rate and corresponding full-time equivalent enrollment for the approved private school for the prior school year shall equal the amount calculated under subsection (a.2). **An approved private school may enroll students in excess of the approved full-time equivalent enrollment. Where an approved private school enrolls students in excess of the approved full-time equivalent enrollment, it must show a corresponding decrease in its approved tuition rate.** (Emphasis added).

tion 1308 of the Code, 24 P.S. § 13–1308 (providing that a school district of residence is responsible for educational costs associated with students attending residential schools located within the boundary of another school district).

There are limited supplemental funds appropriated to aid school districts by sharing the cost of educating special education students placed in APSs. One example of such supplemental funding is that available under Section 1376 of the Code. After being amended by Act 70 of 2004, Section 1376 of the Code now provides for a specific process for distributing this limited supplemental funding to APSs. The process for distributing funds begins with the statutory calculation which determines the portion of the APS appropriation that will be distributed to each APS. 24 P.S. § 13–1376(a.2)(1). After an APS has been notified of its portion of the allocation, the APS submits budget information to the Department, which includes its proposed tuition rate and projected full-time equivalent enrollment number. 24 P.S. § 13–1376(c.4). The Department then reviews the APS budget information and determines an approved tuition rate and approved full-time equivalent enrollment number. 24 P.S. § 13–1376(c.5). The funds are then distributed to APSs in 12 equal monthly payments. 24 P.S. § 13–1376(a.2)(3). When a student is placed at an APS and has been approved by the

Department to receive Commonwealth funding, the Commonwealth pays 60% of the tuition and the school district of residence pays the remaining 40%. When there are no Department-funded slots available, though, the school district has to pay the entire cost of educating special education students out of its own budget.

With that background, the dispute in this case arose after the individualized education program (IEP) teams for W.R. and E.G., two special education students who reside in the District, determined that they required educational services at APSs, and the District enrolled them in the Devereux School and the Melmark School, respectively, during the 2009–2010 school year. Since W.R. and E.G. enrolled at the APSs, the District has paid for their full tuition and maintenance costs, with the exception of $13,883.59 in contingency funds received from the Bureau of Special Education (Bureau) for the 2010–2011 school year. There is no dispute that their placement in those schools is appropriate. The District requested payment[2] for what it contends is the Commonwealth's share of those costs under Section 1376. The Bureau denied the District's requests because the APSs lacked a Department-funded 4010 placement slot for the students and there were no funds available to fund the request in the state budget for the 2009–2010 fiscal year.[3]

---

**2.** A school district requests Section 1376 funding on a Department form entitled "Application for Educational Assignment to an Approved Private School" (4010 form). "4010 slot" generally refers to the position or "slot" for a student for which partial Commonwealth funding remains available at an APS. The Bureau will approve funding requests submitted via a 4010 form if all of the following pieces of information are provided: district signature, parent signature, Notice of Recommended Education Placements (NOREP), and an APS letter of acceptance indicating placement in a 4010 slot. The Bu-

reau's practice is to return a 4010 form as incomplete when an APS does not accept a student into a 4010 slot. The Bureau uses the 4010 form approval process only for funding purposes, and it does not approve or disapprove the actual enrollment of a student at an APS or conduct an educational or other substantive review of the 4010 form. (Referee's Finding of Fact Nos. 2–7).

**3.** For the 2009–2010, 2010–2011 and 2011–2012 school years, the appropriation for APSs has been exhausted. (Referee's Finding of Fact No. 18).

The District appealed the Bureau's denial letter to the Secretary, contending, *inter alia*, that the Department is required to make funding determinations for special education students under Section 1376 of the Code based on the appropriateness of a student's placement at an APS, not on the availability of Department-funded 4010 slots. Therefore, the District argued, the Department must reimburse it for 60% of W.R. and E.G.'s approved tuition costs as required by Section 1376, regardless of whether doing so would exceed the APS appropriation. In his Decision and Order,[4] the Secretary concluded that the Bureau's denial of the District's requests for funding was consistent with Section 1376 of the Code, stating:

> The design of section 1376 warrants the Bureau's practice of limiting approvals to an annual number of placement slots at each APS that are established by an annual budgeting process, not by student need. These students were never approved by their respective APSs in slots that were eligible for reimbursement under Section 1376 and were not approved by the Bureau. Funding of such placements would cause the Department to exceed its appropriation for

APSs, which is prohibited under the Pennsylvania Constitution.

(Secretary's April 25, 2012 Decision and Order at 3). The Secretary further explained:

> There can be no dispute that the resources of the APS program are limited and that the [Department] is constitutionally and statutorily barred from spending more than appropriated amounts for the APS program. Contrary to the District's argument that the "approval" referred to in section 1376 means the approval of the appropriateness of an APS placement, section 1376 in the whole deals with the state's funding of these placements. Thus, there is little merit in the District's contention that if a placement is appropriate, the Bureau must *ipso facto* approve the funding of the placement.

*Id.* at 17. This appeal by the District followed.[5]

On appeal, the District again contends that the Department can only make funding determinations under Section 1376 of the Code based on the appropriateness of a student's placement at an APS, not on the availability of Department-funded slots.[6] If the funding needs exceed the

---

**4.** No hearing was held before the Secretary because the parties resolved all factual disputes through a set of stipulations.

**5.** "This Court's standard of review of a decision of the Secretary of Education is limited to [the] determination of whether substantial evidence supports necessary factual findings, and whether an error of law or constitutional violation was committed." *Curl v. Solanco School District*, 936 A.2d 183, 185 n. 1 (Pa. Cmwlth.2007).

**6.** In support of this argument, the District cites to 22 Pa.Code §§ 171.16 and 171.19. Section 171.16, relating to assignment of students at APSs, provides, in relevant part:

> (g) *Application for Department approval.* When approval of an assignment to an approved private school is sought, the school

district shall forward to the Department an application for approval. The application shall include the certification or explanation required by subsection (c) and a copy of the notices sent to the parents by the school district.

> (1) *Approval.* The Department will approve or disapprove the assignment within 15 days of receipt of the application for approval. If the application is not acted upon within 15 days, it shall be deemed approved.

Section 171.19, relating to funding, provides, in relevant part, that "[t]he Department will approve tuition or tuition and maintenance payment for handicapped persons assigned to approved private school programs and services in accordance with § 171.16." The District reads these two sec-

APS appropriation for appropriate students, the District argues that the Department, under Section 1376 of the Code, must apportion the available monies on a *pro rata* basis among all APSs. In support of that position, the District cites to Section 1376(c.5), which it contends obligates an APS to reduce its tuition rate if it accepts more students than have been approved by the Department, rather than impose the costs of those placements on school districts. The District's argument is not supportable because it is based on several premises not supported by the language of Section 1376 of the Code.

First, the argument presumes that the Department has any role under Section 1376 in approving the appropriateness of a student's placement in an APS. In arriving at that presumption, the District seems to suggest that under Section 1376, the Department makes two separate determinations: one, whether an APS education is appropriate and, after it makes that determination, whether to fund that education. However, under Section 1376, the Department makes no determination as to the appropriateness of the placement but only approves funding for the placement based on whether there is a funded slot at the school available.[7] And, as here, where there is no funded slot, the Department denies approval of funding for the placement.[8] Moreover, as the Department notes in its brief, although it once played a role in the placement of students at APSs pursuant to those regulations, it has since determined that any substantive approval of educational appropriateness of placement at an APS is contrary to federal law.[9]

Ignoring that the Department makes no determination regarding the appropriateness of placing a student in an APS, the second presumption that the District makes is that if there are more students than slots available, then the Department must provide funding, on a *pro rata* basis, to every APS student placed by his or her district. In making that argument, the District relies on *Ashbourne School v. Department of Education*, 43 Pa.Cmwlth. 593, 403 A.2d 161 (1979). That case, decided prior to the 2004 amendment to Section 1376, involved a challenge by 12 private schools (Petitioners) of the Secretary's decision ordering reimbursement to the schools for special education services on a *pro rata* basis for the 1975–76 and 1976–77 school years. Of significance in that case is the fact that Act 144, P.L. 484, which was passed on December 15, 1975, and was made retroactive to the beginning of the 1975–76 school year, amended Section 1376 of the Code in several ways, including

tions together to mean that if the Department approves a student's assignment to an APS under § 171.16, that student is guaranteed funding pursuant to § 171.19. Moreover, the District argues that because the Department did not act on the applications of W.R. and E.G. within 15 days, the applications must be deemed approved under § 171.16.

7. The parties stipulated that the Department does not approve or disapprove the actual enrollment of a student at an APS or conduct an educational or other substantive review of the 4010 form. (Referee's Finding of Fact No. 6).

8. Although the Department's regulations at 22 Pa.Code §§ 171.16 and 171.19 appear to equate a determination of funding with a determination of appropriateness of placement at an APS, those regulations were adopted prior to the 2004 amendment to Section 1376.

9. Special education services must be provided in conformity with an IEP. 34 C.F.R. § 300.17. A student's placement in a school must be based on the IEP. 34 C.F.R. § 300.116. A student's IEP team does not include any representative of the Department and, therefore, the Department plays no role in determining the educational appropriateness of the placement of a special education student at an APS.

establishing higher maximum tuition rates for APSs. Petitioners, availing themselves of the new tuition rates, submitted financial data to the Department with claims which exceeded the pre-Act 144 rates. However, the legislature failed to appropriate sufficient funds to meet those new tuition rates (in part due to the removal of $1,000,000 from the Department's 1975–76 APS appropriation in order to fund emergency flood relief) and, accordingly, the Department notified Petitioners that the appropriation had been depleted and that they should have no expectation of future payment. The Secretary ultimately determined that the appropriate method for distributing the remaining available funds would be apportioning the available monies on a *pro rata* basis to Petitioners. As this Court explained:

> The Secretary, obviously concerned about the equitable distribution of the remaining available funds, discussed three possible ways to solve the dilemma. The first possible course of action would have been to pay all allowable claims on a "first come, first served" basis. This was rejected outright as being grossly unfair and a possible violation of equal protection. The next possibility would have been for the Department to request a deficiency appropriation from the legislature. This was also discounted, since the Secretary felt compelled to honor the commitment of her predecessor who had promised the General Assembly that he would not secure a deficiency appropriation. The final possible course of action, and the one which was ultimately determined to be the most equitable, was to apportion the available monies on a pro rata basis

so that each school received the same proportion of its approved tuition and room and board charges as every other school.

*Ashbourne School*, 403 A.2d at 163. Petitioners, seeking to have all their claims completely satisfied, argued on appeal that the Secretary erred in concluding that proration was proper and should have instead utilized any state appropriation for special education to satisfy its debts to Petitioners, regardless of the specific purpose attached by the legislature to that appropriation. We denied Petitioners' appeal, noting that "where the General Assembly has allocated specific funds from which payments are to be made to these approved private schools, the Department is powerless to use funds appropriated for other purposes to satisfy its debts to Petitioners." *Id.* at 164.

The District interprets our holding in *Ashbourne School* for the proposition that the Department must provide funding on a *pro rata* basis to every special education student who has been placed in an APS by his or her school district. However, the District's reliance on *Ashbourne School* is misplaced because that case dealt with a situation in which the Department had already approved funding for placements of students at APSs, but was ultimately unable to provide funds due to an inadequate appropriation. Not only was *Ashbourne School* decided under a different statutory scheme in the prior version of Section 1376, this appeal presents an entirely different factual scenario because the Department's funding of W.R. and E.G. at their respective APSs was never approved.[10]

The final flawed presumption that the District makes is that under Section

---

10. As noted by the Department, accepting the District's position that the Department must provide funding to all special education students on a *pro rata* basis would have a number of negative policy implications, including

a loss in predictability of funding for both school districts and APSs, as well as the possibility that Section 1376 funding could be rendered an inconsequential funding source due to the number of students enrolled at APSs.

1376(c.5), an APS is required to reduce its tuition rate if it accepts more students than have been approved by the Department, rather than impose the costs of those placements on school districts. The District cites to the portion of that section which states:

> An approved private school may enroll students in excess of the approved full-time equivalent enrollment.[11] Where an approved private school enrolls students in excess of the approved full-time equivalent enrollment, it must show a corresponding decrease in its approved tuition rate.

24 P.S. § 13–1376(c.5). Under the District's interpretation, that section was written "to expressly allow APSs to enroll students beyond the approved numbers while maintaining the ability of [the Department] to maintain stable appropriations and continuing to approve placements for those students for whom the placements are appropriate by requiring a decrease in the APS's tuition rate." (District's Brief at 26). According to the District, the Bureau should have directed the Devereux School and the Melmark School to decrease their tuition costs so that W.R. and E.G. could receive supplemental Commonwealth funds pursuant to Section 1376.

That argument is based on the presumption that any student that is placed by any district in an APS is an "approved" placement, when the only "approved" place-ments are those for which the Department has approved funding. Moreover, the number of approved 4010 funded slots at an APS is equal to the "full-time equivalent enrollment number." APSs do not include students who are not in 4010 slots in the calculation for full-time equivalent enrollment. (Referee's Finding of Fact Nos. 9, 16). As the Secretary reasoned, Section 1376(c.5) was "intended to prevent an APS from enrolling more students in APS slots than its annual allotment with an expectation of receiving future payment from the Commonwealth that exceed annual appropriations." (Secretary's April 25, 2012 Decision and Order at 19).[12]

In sum, under Section 1376 of the Code, the Department correctly makes funding determinations for the education of special education students at APSs based on the availability of Department-funded slots at the APSs, there is nothing in Section 1376 that authorizes a *pro rata* distribution of the appropriated amount to include students not approved by the Department for funding, and Section 1376 does not require APSs to reduce their tuition if they accept more students than have been approved by the Department. Accordingly, the order of the Secretary denying the District reimbursement for W.R. and E.G.'s tuition and maintenance costs at their respective APSs is affirmed.

Judge BROBSON concurs in the result only.

---

11. The Bureau treats the number of 4010 slots at an APS as equal to the "full-time equivalent enrollment number." APSs do not include students who are not in 4010 slots in the calculation for full-time equivalent enrollment. (Referee's Finding of Fact Nos. 9, 16).

12. The District also argues that the Department inappropriately delegated its authority to APSs, which are private entities, to make the determination of whether each student is approved to receive a Commonwealth-funded 4010 slot. Such a delegation, the District argues, violates Article 3, Section 31 of the Pennsylvania Constitution, Pa. Const. art. III, § 31, which provides that "[t]he general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any . . . money, property or effects . . . or to levy taxes or perform any municipal function . . ." Contrary to that assertion, APSs do not choose which students receive Commonwealth funding; the Department does when it approves funding for placement in an APS.

## ORDER

AND NOW, this 7th day of *January*, 2013, the order of the Secretary, Department of Education, Commonwealth of Pennsylvania, dated April 25, 2012, at EDU–2011–SLAP–0185155, is affirmed.